UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CADENCE DESIGN SYSTEMS, INC.,
MAGMA DESIGN AUTOMATION, INC.,
ALTERA CORP., and MENTOR GRAPHICS
CORP.,

                Plaintiffs,

  v.

NARPAT BHANDARI AND VANGUARD
SYSTEMS, INC.,

                Defendants.

No. C 07-00823 MHP

**MEMORANDUM & ORDER**
**Re: Plaintiff's Motion for Summary Judgment**

    Plaintiffs Cadence Design Energy Laboratory Company, Inc., Magma Design Automation, Inc., Altera Corp., and Mentor Graphics Corp. brought this action against defendants Narpat Bhandari ("Bhandari") and Vanguard Systems, Inc. ("Vanguard"). Now before the court is plaintiffs' motion for summary judgment that LSI Logic, Inc. ("LSI"), who is not a party to this case, is the owner of U.S. Patent Number 5,663,900 (the "'900 patent"), and that defendants' counterclaims for infringement must be dismissed for lack of standing. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

    In the early 1990s, LSI was primarily engaged in the design, development, manufacture and marketing of application-specific integrated circuits ("ASICs"). ASICs are customized integrated

circuits designed to meet the particular requirements of individual customers in the semiconductor industry. Pl.'s Motion at 2. To create integrated circuits, semiconductor companies like LSI use sophisticated electronic design automation ("EDA") tools. EDA refers to computer-aided techniques for designing, simulating, emulating and manufacturing integrated circuits. Typically, customers brought LSI a set of requirements and specifications that an ASIC needed to satisfy. Id. at 3. LSI then created a software model of an ASIC design meeting the customer requirements, and used EDA tools to simulate that model to check that the design operated correctly. After successfully simulating the ASIC design, LSI often emulated the design as well. Through emulation, LSI would verify that an ASIC operated in its intended environment. Id. at 3.

      Concomitant with ASIC production, LSI also invested in the research and development of its own proprietary EDA tools. Pollack Dec., Exh. A at 5, 14-15. EDA tools were integral to improving the quality and cost-effectiveness of LSI's ASIC products, allowing LSI to simulate and test ASICs without having to first fabricate a physical prototype. In its corporate disclosures and 10K for the period ending January 2, 1994, LSI disclosed that it "ha[d] developed and offers to its customers its proprietary design tools [that] . . . improve the circuit designers's productivity." Pollock Dec., Exh. A at 5. LSI obtained patent protection for its proprietary EDA tools, including patents relating to simulation and emulation tools. LSI licensed its proprietary design tools to its customers. LSI's founder confirmed the role of EDA tools in LSI's business, stating that LSI has always been "an EDA company," and not merely an ASIC company, because EDA tools and technology facilitated LSI's competitiveness in ASIC production. Pollack Dec., Exh. C at 90:18-23.

      Daniel Watkins ("Watkins") is not a party to this suit, but was a business partner and co-inventor of defendant Bhandari. Watkins was an employee of LSI from 1985 through 2003. As a condition of his employment with LSI, Watkins signed an Employee Invention and Confidential Information Agreement (the "Invention Agreement"). Section 3 of the Invention Agreement assigned and transferred to LSI any inventions Watkins made or conceived, while he was employed by LSI, using company resources or which related in any manner to the "actual or demonstratively anticipated business, work, or research and development of the Company or its subsidiaries."

2

(Section 3 has been quoted in full in the discussion section below). Pollack Dec., Exh. C at 1-2. Section 10 of the Invention Agreement provided that the Agreement could not be modified except by a written, signed document. Id. at 3.

From July 1992 through July 1995, Watkins worked exclusively in LSI's Mega-Functions and Cores group division. Watkins' work in that division related to designing and developing digital logic for ASICs. His specific duties included function development, function library management, core development, core library management and customer support. Goldstein Dec., Exh. A. In performing these duties, Watkins used EDA tools. For instance, Watkins used LSI's proprietary test patterns and simulation models to verify that the integrated circuit designs operated correctly prior to fabricating the integrated circuits. Watkins later developed a concept for an ASIC emulator which he believed would "accelerate LSI's product development." The patent claiming this concept issued as U.S. Patent Number 4,901,259 (the "'259 patent"). It discloses an EDA tool for "the 'real-time' simulation of application specific integrated circuits (ASICs) in the actual digital computer system in which they will be incorporated." Watkins is also named as inventor on U.S. Patent Number 5,220,512 (the "'512 patent") entitled "System for Simultaneous Interactive Presentation of Electronic Circuit Diagrams and Simulation Data." In addition to the '259 and '512 patents, both of which relate to EDA tools and both of which were assigned to LSI under the Invention Agreement, Watkins is a named inventor on over sixty additional patents and published patent applications assigned to LSI.

In 1993, a group including Watkins and defendant Bhandari founded Vasona Systems, Inc. ("Vasona") to develop and market EDA technology. During this period Watkins maintained his employment with LSI. Using his LSI email account, Watkins sent Bhandari at least one email pertaining to Vasona's proposed business plan and a proposed EDA verification tool. Vasona hired the law firm of Fenwick and West LLP to prosecute a patent application for a proposed EDA system that as conceived, could be used to simulate a variety of different integrated circuits, including the ASICs developed by LSI. The Fenwick and West attorney responsible for prosecuting the patent advised Bhandari that under Watkins' Invention Agreement, LSI could claim ownership of the

3

invention. While at LSI during working hours, Watkins used LSI's fax machines at least twice to send the law firm notes related to the patent application. On September 10, 1993 Bhandari and Watson filed a patent application for their proposed EDA system. The resulting '900 patent issued on September 2, 1997. The '900 patent was entitled "electronic emulation and simulation system" and named Bhandari and Watson as co-inventors and Vasona as assignee. Pollack Dec., Exh. S. As part of its 1994 business plan, Vasona named LSI as a target customer.

In May 1998 Watkins sent a letter disclosing the '900 patent to LSI for the first time. In this letter Watkins requested that LSI confirm that it did not have an ownership interest in the '900 patent. After an internal investigation of the matter, LSI rejected Watkins' request and informed him of its belief that the '900 patent was covered by the Invention Agreement. Subsequently, on August 4, 1998 Watkins sent another letter to LSI offering LSI a nonexclusive license of the '900 patent and proffering a proposed royalty-free license agreement. This offer was then rejected in an August 25, 1998 memorandum in which LSI opined that it owned an undivided one-half interest in the '900 patent under the Invention Agreement. Then, on September 21, 1998 Watkins and Bhandari sent LSI another letter proposing a joint ownership agreement and stating that LSI's Human Resources manager had advised Watkins that his outside consultation work relating to the development of software verification tools would not pose a conflict with his duties. LSI again rebuffed Watkins' and Bhandari's efforts in a September 21, 1998 memorandum reiterating its belief that LSI had an ownership interest in the '900 patent.

Subsequently, LSI changed the primary correspondence address in the Patent and Trademark Office ("PTO") file for the '900 patent from Vasona to LSI without first seeking or obtaining Vasona's, Watkins' or Bhandari's consent or permission. Vasona paid development costs for the invention embodied in the '900 patent and absorbed all expenses related to the prosecution of the '900 patent. LSI did not reimburse Vasona for the these costs and expenses. Thereafter, LSI continued to correspond with the PTO and paid all required maintenance fees for the '900 patent. LSI also changed the power of attorney from Vasona to LSI without first seeking consent.

Having never sold any products or made any revenue, Vasona disbanded. Pl.'s Motion at 11.

4

1  Bhandari then started a new company, Vanguard, and signed a document assigning the '900 patent
2  from Vasona to Vanguard. Id. Bhandari is the sole owner of Vanguard. Id. On November 11, 2006
3  Bhandari filed a patent infringement suit in the Eastern District of Texas against plaintiffs and other
4  companies. The court dismissed the complaint on the grounds that Bhandari had assigned his
5  interest to Vanguard and thus did not have standing to bring suit for infringement of the '900 patent.
6  Nguyen Dec., Exh. B (May 11, 2007 Order of Judge Davis).

   Plaintiffs filed this action for declaratory judgment on February 8, 2007. On March 1, 2007
plaintiffs licensed the '900 patent from LSI. Under the license agreements, LSI released each
plaintiff from any and all claims of past infringement and granted them non-exclusive licenses to
practice the invention covered by the '900 patent. Plaintiffs now move for summary judgment on
LSI's ownership of the '900 patent and the corresponding dismissal of defendants' counterclaims for
infringement based on lack of standing.

LEGAL STANDARD

   Summary judgment is proper when the pleadings, discovery and affidavits show that there is
"no genuine issue as to any material fact and that the moving party is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the
case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is
genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving
party. Id. The party moving for summary judgment bears the burden of identifying those portions
of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of
material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the
opposing party will have the burden of proof at trial, the moving party need only point out "that
there is an absence of evidence to support the nonmoving party's case." Id.

   Once the moving party meets its initial burden, the nonmoving party must go beyond the
pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

5

party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof."  Fed. R. Civ. P. 56(a).  "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).

DISCUSSION

The issue before the court is whether, under the Invention Agreement signed by Watkins, the '900 patent was assigned to LSI, making LSI the legitimate owner of the patent.  Section 3 of the Invention Agreement states:

> I [Watkins] hereby assign and transfer to the Company [LSI] my entire right, title, and interest in and to all inventions (as used in this Agreement, "inventions" shall include ideas, improvements, designs and discoveries), whether or not patentable and whether or not reduced to practice, made or conceived by me (whether made solely by me or jointly with others) during the period of my employment with the Company which are [1] made with the Company's equipment, supplies, facilities, trade secrets, or time, **or** [2] which relate in any manner to the actual or demonstratively anticipated business, work, or research and development of the Company or its subsidiaries, **or** [3] which results from or is suggested by any task assigned to me or any work performed by me for or on behalf of the Company or its subsidiaries.  This Agreement does not require assignment of an invention which is the subject of Section 2870 of the California Labor Code (hereinafter "Section 2870").

Pollack Dec., Exh. C Section 3 (emphasis and brackets added).

The court will address several threshold issues before turning to the parties' main dispute regarding whether the '900 patent "relates to" LSI's business.  First, the agreement is an enforceable contract under California law.  Both Watkins and LSI assented to its terms and Watkins received valid consideration in the form of compensation from LSI.  Second, defendants argue that the agreement was modified by a later oral agreement in which LSI's human resources manager, Jon Gibson, represented to Watkins that his work with Bhandari and Vasona would not conflict with the

6

Invention Agreement. This oral modification, if it occurred at all[2], however, is ineffective to change the terms of the Invention Agreement because the Agreement specifically prohibited modifications not in writing and signed by both Watkins and LSI. Pollack Dec., Exh. C Section 10 ("[t]his Agreement may not be changed, modified, released, discharged, abandoned, or otherwise amended, in whole or in part, except by an instrument in writing, signed by the Employee and the Company"). Third, the Invention Agreement assigns to LSI any invention conceived by Watkins, regardless of whether it was conceived solely by Watkins or in collaboration with others. That Watkins worked with Bhandari, rather than alone, is therefore immaterial. Fourth, the '900 patent is assigned to LSI if Watkins was employed at LSI when it was conceived or made. This is undisputed. Watkins was employed continuously with LSI from 1985 through 2003; the '900 patent was not only conceived but was also filed and prosecuted in 1993; and the patent was ultimately issued in 1997. Finally, assignment to LSI was automatic upon filing of the patent listing Watkins as a co-inventor. Other than execution of the Invention Agreement, no further action was necessary for the assignment to be effective. ViChip Corp. v. Lee, 438 F. Supp. 2d 1087, 1094-95 (N.D. Cal. 2006) (agreement that provided that the employee "assigns" rather than "agrees to assign" automatically transfers the patent without further affirmative steps by the employer).

The court now turns to the main issue regarding the scope of the subject matter assigned to LSI under the Invention Agreement. California Labor Code section 2870 places limitations on the types of inventions that an employee can be required to assign to an employer.[3] If the invention falls within the protection of section 2870, an agreement purporting to assign the invention is unenforceable. Lab. Code § 2870(b) ("To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable"). The Invention Agreement is drafted as a mirror image of California Labor Code section 2870. The language of the Agreement closely tracks the language of section 2870, and the Agreement expressly references the statute. Pollack Dec., Exh. D Section 3 ("This [Invention] Agreement does not require assignment of an invention which is the subject of Section 2870 of the

7

1  California Labor Code"). The scope of the Invention Agreement is therefore coextensive with the
2  scope of section 2870—the Agreement assigns to LSI all inventions that section 2870 does not
3  specifically prohibit. Iconix, Inc. V. Tokuda, 457 F. Supp. 2d 969, 992 (N.D. Cal. 2006)
4  (agreements that explicitly incorporate sec. 2870 are interpreted as having the same scope as the
5  statute). Section 2870 contemplates three independent scenarios in which an assignment is valid and
6  enforceable, and the Invention Agreement tracks these three scenarios.[4] The "related to" prong[5]
7  assigns to LSI all inventions that "relate in any manner to the actual or demonstrably anticipated
8  business, work, or research and development of [LSI] or its subsidiaries." Under section 2870(a)(1),
9  this type of assignment agreement is specifically exempted and is therefore enforceable. The
10 question for the court, then, is whether the '900 patent is "related to" LSI's business or actual or
11 anticipated research or development. The employee bears the burden to show that his invention
12 comes within Labor Code section 2870. Lab. Code § 2872.

13       Courts interpreting employee assignment agreements in the context of section 2870 have
14 construed the "related to" phrase broadly. Cubic Corp v. Marty, 229 Cal. Rptr. 438 (Cal. Ct. App.
15 1986). In Cubic, the employee signed an invention agreement which assigned all inventions
16 "coming within the scope Company's business or related to Company's products or to any research,
17 design experimental or production work carried on by Company." Id. at 444. The employee
18 invented an electronic warfare simulator, which the employer did not yet have in its product line.
19 The warfare simulator was a stand-alone product which did not necessarily have to be used in
20 conjunction with the employer's pilot training programs. Id. at 447. The court held that the
21 employee's invention was related to the employer's business and its assignment was enforceable in
22 light of section 2870. Id. at 451-452 The court found that the employee presented his invention to
23 the employer as "something to enhance" the employer's existing product line; that he designed the
24 warfare simulator to function with the employer's pilot training program; and that the patent
25 application stated the "preferred embodiment" of the invention was the employer's pilot training
26 program. The employee himself recognized that his invention was related to his employer's
27 business. Id. at 447.
28

As in Cubic, the '900 patent in this case is related to LSI's business. In the early 1990's, when the '900 patent was conceived, LSI's primary business was the design, development, manufacture and marketing of ASICs. EDA tools were integral to LSI's business because they improved the quality and cost-effectiveness of their ASIC products. For example, the EDA tools allowed LSI to simulate, test and verify the integrated circuit designs prior to their physical manufacture. Because of their importance, LSI invested in the research and development of its own proprietary EDA tools. Beginning in 1990, LSI began obtaining patent protection for its proprietary EDA tools and LSI profited from licensing these tools to its customers. These facts are supported by a 1994 SEC filing stating that LSI "ha[d] developed and offers to its customers its proprietary software design tools...[that] improve the circuit designer's productivity." Pollack Dec., Exh. A at 5.

Watkins himself used EDA tools at LSI and was named an inventor on patents which were assigned to LSI under the Invention Agreement. Pollack Dec., Exh E (patent 4,901,259 issued in 1990) & F (patent 5,220,512 issued in 1993). The '259 patent was for "the 'real-time' simulation of application specific integrated circuits (ASICs)," and the '512 patent was entitled "System for Simultaneous Interactive Presentation of Electronic Circuit Diagrams and Simulation Data." It is undisputed that these two patents, developed in 1990 and 1993, were related to EDA tools. Stipulated Statement of Undisputed Facts ¶ 25-26.

In addition, like the employee in Cubic, there is evidence indicating that Watkins and Bhandari themselves recognized that the '900 patent was related to LSI's business. The '900 patent application states that EDA tools are "used to define and verify prototype systems, such as various application specific integrated circuits (ASICs)." Pollack Dec., Exh. S. Prior to the filing of the patent application, an attorney from the law firm of Fenwick and West LLP advised Bhandari that LSI could claim ownership of the invention under Watkins' Invention Agreement. Pollack Dec., Exh. O. Despite the risks, Bhandari chose to proceed with the patent application. Id. After the application was filed, Watkins and Bhandari formed a business plan for Vasona in 1994, naming LSI as a target customer for their proposed EDA system. Pollack Dec., Exh. M at BHA 000362 (filed under seal).

It is undisputed that the '900 patent relates to EDA tools. Stipulated Statement of Undisputed Facts ¶ 27. It is also undisputed that LSI's business relied on EDA tools to manufacture ASICs, and that the design and development of EDA tools was part of LSI's business. Id. at ¶¶ 2-5, 8-11. Based on all of the evidence in the record, the court concludes that there is no genuine issue of material fact as to whether the '900 patent was related to LSI's business at the time the patent was conceived. Accordingly, defendants have no ownership interest in the '900 patent and their counterclaims must be dismissed for lack of standing.

Given the overwhelming strength of the evidence in the record, defendants do not attempt to dispute that the '900 patent is related---in the general sense described above---to the business of LSI. Instead, defendants urge this court to construe narrowly the meaning of the phrase "relate to the employer's business" as it is used in section 2870(a)(1) and mirrored in the Invention Agreement. Defendants argue that under the legislative history of section 2870, an invention is not assigned to the employer unless it is related to the smallest business division in which the employee actually works. Defendants allege that LSI is a conglomerate, multi-divisional company. Watkins worked in the Mega-Functions and Cores group division between 1992 and 1995. While Watkins' division used EDA tools, these divisions did not design or develop EDA technology. Thus, defendants argue, the work of Watkins' divisions did not relate to the '900 patent which involved the design and development of EDA tools.

Defendants are wrong both as a matter of fact and as a matter of law. First, as a matter of fact, the record does not support the assertion that Watkins did not design and develop EDA tools as part of the actual work he did in his division. It is undisputed that while employed at LSI and around the time he conceived the '900 patent, Watkins' was named inventor on two EDA-related patents assigned to LSI (the '512 and '259 patents). LSI, moreover, was not a conglomerate business with many unrelated product lines and divisions. As evidenced in its 1994 SEC filing, LSI's primary business at the time Watkins' conceived of the '900 patent was the design and development of ASICs for which EDA tools were a vital component. There is no contrary evidence in the record to suggest that LSI was engaged in any other business.

As to the question of law regarding whether section 2870 should be interpreted narrowly, defendants cite selectively to the legislative history of AB 474, the bill that first enacted section 2870 during the 1978-1979 legislative session. Defendants rely on a June 5, 1979[6] letter from Assemblyman Terry Goggin to the members of the California Legislature advocating the smallest-business-division approach. Goldstein Dec., Exh. B. Assemblyman Goggin was the author of AB 474[7]. Whether Goggin's letter embodies legislative intent depends on whether his views were adopted or rejected by the legislature as a whole. Indeed, not "every scrap of paper that is generated in the legislative process constitutes" "cognizable legislative history." Kaufman v. Performance Plastering, 133 Cal. App. 4th 26, 29 (2005). "Statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation." Id. at 30. Assemblyman Goggin requested that his letter be entered into the Senate Journal as an expression of legislative intent regarding the definition and scope of the phrase "relate to the employer's business." When Goggin's letter became public, however, the Senate Industrial Relations Committee received comments from numerous companies opposing the smallest-business-division interpretation. See, e.g. Senate Industrial Relations Committee File 1979-80 (opposition letters from McDonnell Douglas, Aerojet-General Corporation, and Monogram Industries, Inc.). The Senate Committee then instructed Goggin "to reach an accommodation with" the opponents. Nguyen Dec., Exh. C at 10 (J.B. McGuire, "Employment-Invention Contracts, A History of California Code Sections 2870-2892," California State Bar Journal, DOPU). The Committee, moreover, "ignored and refused to accept Goggin's letter" and it was never entered into the Senate Journal. Id.; Senate Industrial Relations Committee File 1979-80 (August 17, 1979 Committee summary of AB 474, stating, "[a]t the time this bill was first heard by this committee, the author indicated that he intended to enter a letter of intent in the Assembly and Senate Journals indicating that the definition of "employer" for the purpose of a conglomerate corporation would be the smallest unit of the corporation. *The author has now decided not to enter this letter in the Journals*." (emphasis added)). Ultimately, the language of the statute contained a broad phrase permitting assignments of inventions that "relate to

the business of the employer." Had the California Legislature intended the statute to be restricted to the smallest business division in which the employee actually works, they would have used such language in the statute itself. Defendants' narrow interpretation is contrary to the legislative history of section 2870, the statute's plain language, and precedent caselaw such as <u>Cubic</u>.

As a final matter, the court need not decide the issue of whether the '900 patent is assigned to LSI under an alternative prong of the Invention Agreement covering inventions "made with [LSI's] equipment, supplies, facilities, trade secrets, or time." The record contains evidence that Watkins worked on drafting and prosecuting the patent applications while he was physically present at LSI's facilities, during normal business hours, and that he used LSI's fax and email to communicate with Bhandari and the law firm prosecuting the '900 patent. Pollack Dec., Exh. P, L, Q. As previously discussed, the Invention Agreement contains three independent prongs on which an invention may be assigned. If any one of them is met, it is immaterial whether the other two are also met. Since the court has concluded that the '900 patent is "related to" LSI's business, it need not also address whether Watkins used company resources to develop it.

CONCLUSION

The court GRANTS plaintiff's motion for summary judgment and DISMISSES each of defendants' counterclaims.

IT IS SO ORDERED.

Dated: November 8, 2007

_____
MARILYN HALL PATEL
United States District Judge
Northern District of California

**ENDNOTES**

1. Unless otherwise noted, all facts are taken from the Stipulated Statement of Undisputed Facts.

2. Watkins has testified that he apprised LSI of his relationship with Bhandari and Vasona when they first began their venture in 1993 and that Jon Gibson gave his approval. Watkins Dec. ¶ 7; Watkins Tr. at 174:21–175:5. Jon Gibson has testified that he has no recollection of any conversation with Watkins regarding his work with Bhandari and Vasona. Gibson Dec. ¶¶ 4–5. Gibson instead testifies that LSI policies would have prevented him from authorizing Watkins' work with Vasona because LSI required employees to obtain written permission from their immediate supervisor, not human resources personnel. Id.  This factual dispute, however, does not raise a genuine issue of material fact because the Invention Agreement clearly prevents such oral modifications.

3. California Labor Code section 2870(a) states, "[a]ny provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) Result from any work performed by the employee for the employer."

4. The prefatory language of section 2870(a) restricts application of the statute to "an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information." Thus, if the invention *was* developed using the employer's time or resources, then the statute does not prohibit assignment and such agreements are enforceable. This is true regardless of whether the invention relates to the business of the employer (sec. 2870(a)(1)) or whether the invention resulted from work performed by the employee for the employer (sec. 2870(a)(2)). In the case where the invention was *not* developed using the employer's time or resources, courts have recognized that subparts (a)(1) and (a)(2) are connected with the disjunctive "or" and thus operate independently. Cubic Corp. v. Marty, 185 Cal.App. 3d 438, 452 (1986). If *either* subpart applies, *and* the employee did not use the employer's resources, then the statute does not prohibit assignment and such agreements are enforceable. Iconix v. Tokuda, 457 F. Supp. 2d 969, 989. In sum, there are three independent scenarios in which an agreement assigning an invention to an employer is enforceable under section 2870: (1) The invention was developed using the employer's time *or* resources; *or* (2) The invention relates to the employer's business or actual or demonstrably anticipated research or development; *or* (3) The invention resulted from work performed by the employee for the employer. The Invention Agreement tracks these three scenarios.

5. The other two prongs to LSI (1) an invention "made with the Company's equipment, supplies, facilities, trade secrets, or time"; and (2) an invention which "results from or is suggested by any task assigned to [the employee] or any work performed by [the employee] for or on behalf of the Company or its subsidiaries."

13

6. Assemblyman Goggin's letter states, "The problem of interpretation concerns the definition of the term employer as used in the context and this proposed statute.  A person employed by a conglomerate corporation having multiple divisions...may find that his or her employer's "business" is so varied and far-reaching that any inventions no matter how far afield of the concern of that employee's own division...relates to the business or research and development of the parent corporation.  Such an interpretation of the term employer frustrates the obvious intent of AB 474 that otherwise independent inventions of the employee should belong solely to that employee.  In order to ensure that the patent rights of employees do not fluctuate wildly depending upon the market position of an employees' parent corporation, it is necessary to declare as the legislative intent of AB 474 that in a corporation having multiple divisions..., *the term employee as used in AB 474 shall relate only to the division, affiliate, subsidiary, profit center, or company (whichever unit is smallest) rather than to the parent corporation*."  Goldstein Dec., Exh. B (emphasis added).  The letter that defendants provide is undated and unsigned.  However, Goggin's letter is referenced in a *California State Bar Journal* article ("Employment-Invention Contracts, A History of California Code Sections 2870-2892", J.B. McGuire, DOPU).  The journal article dates the letter as June 5, 1979 and repeats the letter verbatim.  Plaintiffs have supplied this journal article to us as Nguyen Dec., Exh. C at 9.  This letter was located in the Senate Committee file for the 1979-80 legislative session when AB 474 was passed.

7. An earlier bill to enact section 2870 was introduced in the 1977-1978 legislative session, but that bill did not pass.  Senate Final History, AB 2257.